# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| JAMIE E. MEIER,<br><br>    Plaintiff,<br><br>vs.<br><br>FAMILY DOLLAR SERVICES, INC.,<br><br>    Defendant. | No. C05-1016<br><br>**ORDER** |

_____

This matter comes before the court pursuant to defendant's May 5, 2006 motion for summary judgment (docket number 24). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, defendant's motion is granted.

## Introduction

The plaintiff, Jamie A. Meier ("Meier"), was hired by the defendant, Family Dollar Services, Inc. ("Family Dollar") in March of 2002. In May of 1993, Meier sustained a serious head injury from a fall that resulted in some cognitive difficulties. Meier claims that he was discriminated against on the basis of a perceived disability when his employment with Family Dollar was terminated on July 1, 2004. Meier alleges that his discharge violated the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216.6(1)(a), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 et seq. Specifically, Meier claims that Family Dollar failed to accommodate his disability and discharged him because of his disability. Family Dollar claims that it is entitled to summary judgment because Meier cannot, as a matter of law, establish a prima facie case of disability discrimination.

1

Meier also claims that Family Dollar breached a unilateral contract of employment by failing to transfer Meier back to the shipping department upon request when he could not meet production quotas. Family Dollar claims that it is entitled to summary judgment on this issue because no contract was formed and the employment relationship remained at all times at-will.

**Statement of Material Facts Taken in a Light Most Favorable to the Plaintiff**

Meier is a resident of Bellevue, Iowa where he has lived with his parents since suffering a traumatic head injury on May 1, 1993.[1] A July 1993 neuropsychological assessment determined that the accident affected Meier's cognitive skills, memory, mental processing, visual-motor abilities, and visual-spatial organization. In 2005, vocational expert Dr. Bill Asnejo, determined that Meier still suffered from slowed mental processing, etc., as listed above. Dr. Asnejo administered the Adult Basic Learning Examination ("ABLE") which revealed that Meier functioned between an 8th and 12th grade level for problem solving, comprehension, and language skills. Dr. Asnejo further opined that Meier suffered from a "hidden" disability not easily observed like other impairments (i.e., missing limbs or severely impaired vision). Meier did manage to obtain an associate's science degree in marketing management from Northeast Iowa Community College in 1998, however.

On March 11, 2002, Meier was hired as a loader in Family Dollar's shipping department. Meier's job duties included removing items from a conveyor belt and stacking them on a semi truck. Meier performed those duties satisfactorily and qualified for two merit-based salary increases as a result. Regional Vice President Bivona testified that Meier displayed no deficiencies as a shipping loader. Meier requested a transfer to the Bulk Department as a bulk order filler which Family Dollar granted, effective as of April

---

[1] On May 1, 1993, while attending Kirkwood Community College, Meier fell off a balcony and suffered a closed head injury that required brain surgery and extensive rehabilitation. Meier did not complete his education at Kirkwood.

11, 2004. Such a transfer required that Meier be the most senior qualified applicant to apply. Meier began his new work as a bulk order filler on May 17, 2004. This job transfer potentially entailed more complicated tasks involving visual coordination (i.e., tapering shrink wrap, applying labels, and placing full cases on the conveyor belt). The supervisor hierarchy for Meier at his new job included: (1) Area Manager Robert Hoult, Meier's immediate superior; (3) Shift Manager for the Bulk and Shipping Departments Keith Diltz; (4) Operations Manager Paul Overmann; and (5) Regional Vice-President Brian Bivona.

Bulk Order production standards require that each section employee successfully meet certain gradually increasing production goals (i.e., engineered standards progression) within six weeks. Failure to meet production goals may result in an employee's receipt of a corrective action review form intended to advise the associate of areas that need improvement. For each corrective action issued, the associate generally repeats the affected week as an opportunity to demonstrate improvement before advancing to the next production standard. The accumulation of four corrective actions may result in an employee's termination.

Meier received Supplemental Social Security income throughout his term of employment at Family Dollar and described his disability as "[m]emory. Reflexes a little bit, not quite as fast as I should, or used to be." Meier remarked to his supervisor Mr. Hoult that "I used to be a pretty good baseball player until my accident happened," but did not so inform any other supervisor.

Meier received a "free week" during his first days as a bulk order filler in that there was no production goal to meet at that time. During the second work week, Meier achieved a 48.9% production rate and received a corrective action because he missed the target rate of 65%. Mr. Overmann observed and instructed Meier on two occasions to help him improve and Meier actually exceeded his production goal when coached. Even though the production goal for the third work week was 75%, Meier's 51.8% rate did not

3

result in a corrective action. However, Meier's failure to meet the fourth week production rate by 7.6% did result in a second corrective action review. Mr. Hoult worked with Meier several times to demonstrate ways to improve productivity. Meier did not actually advise Mr. Hoult of any restrictions or disabilities affecting his productivity potential but some of Meier's coworkers testified that Meier's slowness of thought and processing was apparent.[2] On June 25, Mr. Hoult again supervised and instructed Meier to help this associate meet production demands. Mr. Diltz signed and reviewed with Meier a third corrective action review and final written counseling on June 29, 2004, citing that Meier failed to meet his fifth week production goal of 95% by 10.4%. At the sixth week, Meier reached 70.4%, missing the last production goal of 100%. A fourth corrective action was issued and Meier was terminated that same day on July 1, 2004 without permission to finish out the workday. Prior to termination, Meier used only three absences in eighteen months of employment and missed just one day due to sickness.

Family Dollar provided Meier with a copy of the Family Dollar Associate Handbook ("Handbook") when hired. The Handbook offers the following language on both the first and final pages:

> As with all rules, policies, procedures and benefits, the statements contained in this handbook may change from time to time, and the Company reserves the right to modify, supplement or discontinue any rules, policies, procedures and benefits, with or without notice. The existence of the handbook and the rules, policies, procedures and benefits described herein do not create an employment contract or affect the right of an associate or the company to end the employment relationship at any time for any reason with or without cause.

---

[2] Thomas Roth, vice-president of Bellevue State Bank in Iowa, has known Meier since before the accident and testified that Meier takes longer than normal to process information and respond in conversation. Additionally, vocational expert Dr. Bill Asnejo noted in 2005 that Meier's physical appearance unmistakably shows head trauma (i.e., indentation near the temple).

4

(App. D-8, D-25). The Handbook further states that any contract for employment with an associate must be separate, in writing, and signed by the Chairman and/or the company President. (App. D-8). Additionally, the Handbook provides a policy regarding job transfers within Family Dollar such that a recently transferred employee may, if unsatisfied with the new post and within thirty days of beginning the new job, request his former position within the Company, a General Warehouse position, or terminate his employment. (App. D-24). This transfer policy was posted permanently on the business premises and in plain view for all employees. Any transfer required that the employee remain eligible for a transfer.[3]

Family Dollar policies provide that an employee should let the employer know if and when he needs an accommodation for disability.[4] At the same time, company policy also allows for a "pro-active remedy" by management when it is obvious that an employee suffers from a disability even if no request for accommodation has been made.

## Summary Judgment Standard

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on

---

[3] Mr. Diltz testified that a final corrective action recorded would preclude an employee's eligibility for a transfer.

[4] The fourth and final corrective action review reiterated company policy in the context of engineered production standards by noting that it remains the employee's responsibility to report any problem causing a failure to meet quotas.

5

which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985), cert. denied, 474 U.S. 1057 (1986) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983), cert. denied, 465 U.S. 1026 (1984)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the plaintiffs' position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiffs. Id. Although it has been stated that summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case. Helfter v. UPS, Inc., 115 F.3d 613, 615-16 (8th Cir. 1997). The standard for the plaintiffs to survive summary judgment requires only that the plaintiffs adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions. O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995). To avoid summary judgment, the plaintiffs' evidence must show that the stated reasons were not the real reasons for the plaintiffs' discharge and that prohibited discrimination was the real reason for the plaintiff's discharge. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000) (quoting the district court's jury instructions).

**Conclusions of Law**

Plaintiff's ADA and ICRA Claims

Defendant Family Dollar moves for summary judgment in its favor as to the plaintiffs' discrimination claims (set forth in Counts II and III of the amended complaint[5]). Specifically, Family Dollar asserts that plaintiff has failed to generate any genuine issue of material fact and cannot establish prima facie discrimination. Meier argues that he can establish a prima facie case for recovery under the ADA, thereby precluding summary judgment. This court agrees with Family Dollar.

The ADA forbids employers from discriminating against an otherwise qualified employee with a disability, because of that disability. 42 U.S.C. § 12112(a); Pedigo v. PamTransport, Inc., 60 F.3d 1300 (8th Cir. 1995). A qualified individual with a disability is a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position. 42 U.S.C. § 12111(8).

To establish a prima facie case of employment discrimination under the ADA and ICRA,[6] the plaintiff must show that he (1) was disabled within the meaning of the Act; (2) was at all times relevant to this action qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability. Conant v. City of Hibbing, 271 F.3d 782, 784 (8th Cir. 2001) (citing Cooper v. Olin Corp. Winchester Div., 246 F.3d 1083, 1087 (8th Cir. 2001)). After an ADA plaintiff establishes a prima facie case, a rebuttable presumption of discrimination attaches and the burden shifts to the employer to articulate

---

[5] Counts II and III of the plaintiff's amended complaint allege that Defendant Family Dollar discriminated against the plaintiffs on the basis of perceived disability in violation of the ADA and the Iowa Civil Rights Act (ICRA). See Am. Complaint, at 3-4.

[6] "Iowa courts look to the ADA, its regulatory interpretations, and its caselaw in construing a disability claim under the ICRA." Berg, 169 F.3d at 1144 (citing Fuller v. Iowa Dept. of Human Servs., 576 N.W.2d 324, 329 (Iowa 1998); Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 616 (8th Cir. 1997)).

some "legitimate, nondiscriminatory reason for its action." Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir. 1996), cert. denied, 117 S. Ct. 274 (1996) (citing Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). Once an employer comes forward with such a reason, the presumption is rebutted and "the burden shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." Price, 75 F.3d at 365. At all times, the plaintiff retains the burden of persuading the trier of fact that he has been the victim of discrimination. Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).

### ADA Disabled

Family Dollar claims that Meier has not made the requisite showing that he was disabled within the meaning of the ADA in accordance with 42 U.S.C. § 12102(2)(A)-(C)[7] criteria. Meier resists defendant's claim, arguing that he suffers from a mental impairment. There is no doubt that Meier suffered a closed head injury in 1993, but the issue remains as to whether the severity of said injury and its subsequent effects rise to the level of a disabling impairment under the Act.

"Within the meaning of the ADA, the term 'disability' includes . . . 'being regarded as having' . . . 'a physical or mental impairment that substantially limits one or more of the major life activities' of the individual." Conant v. City of Hibbing, 271 F.3d 782, 784 (8th Cir. 2001) (citing 42 U.S.C. §§ 12102(2)(A), (C)). A plaintiff may also demonstrate disability if there is a record of such a disability or if he is perceived by his employer as being disabled. See 42 U.S.C. § 12102(2)(B)&(C). Accordingly, individuals who are regarded as disabled, but not actually disabled, can still fall within the protection of the ADA. Id. (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). "'Major

---

[7]Disability under this statute requires proof of (1) a physical or mental impairment that substantially limits one or more of plaintiff's major life activities; (2) suffering from a history of such a disability; or (3) an employer regarding the employee as possessing such a disability.

8

life activities' include 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" 29 C.F.R. § 1630.2(I). To establish that an individual is substantially limited in the life activity of working, the individual must show that he is limited from performing a class of jobs or a broad range of jobs within various classes. Berg v. Norand Corp., 169 F.3d 1140, 1145 (8th Cir. 1999). "The inability to perform a single, particular job does *not* constitute a substantial limitation in the major life activity of working." Berg, 169 F.3d at 1145 (emphasis added) (quoting 29 C.F.R § 1630.2(j)(3)(I)).

When testifying as to the nature of his disability, Meier offered this vague description: "[m]emory. Reflexes a little bit, not quite as fast as I should, or used to be." Meier offers no evidence to prove that his head injury substantially limits a major life activity. Meier takes care of all self-care needs and performed satisfactorily for over one year as a shipping loader with Family Dollar. Meier successfully completed an associate's degree in marketing and could conceivably locate jobs outside the manual labor field, but has made no attempt to do so. Meier's failure to meet production standards in a single position (i.e. bulk filler) does not evidence a substantial restriction in working because it does not prohibit Meier from a broad range of positions. Within months of his discharge from Family Dollar, Meier obtained several temporary warehousing positions and later secured steady employment with Swiss Colony's receiving department operating a fork lift. Conclusory statements of disability from some co-workers or social acquaintances in deposition testimony, without more, "are insufficient to withstand a properly-supported motion for summary judgment." Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 616 (8th Cir. 1997) (citing e.g., Berg v. Bruce, 112 F.3d 322, 327-28 (8th Cir. 1997); Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 485 (8th Cir. 1997)).

Meier argues that the medical conclusions of a vocational expert, Dr. Bill Asnejo, and the fact that Meier has received supplemental social security benefits[8] are proof of Meier's disability. This court disagrees. Dr. Asnejo diagnosed Meier as disabled but did not discuss any of those certain additional factors (i.e., the number and types of posts Meier cannot perform; the geographic region to which Meier has reasonable access; and his job training, experience, and expectations) that would demonstrate Meier's inability to pursue a broad range of employment. See, e.g., Helfter, 115 F.3d at 617; Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92 (1999).

With regard to the Social Security claim, the Eighth Circuit has held that while a plaintiff's mere filing of an application for disability benefits does not bar him outright from being an ADA-qualified candidate, "he cannot escape the import of his prior sworn statements" of vocational disability. Downs v. Hawkeye Health Servs., Inc., 148 F.3d 948, 951 (8th Cir. 1998). Specifically, a plaintiff must offer a sufficient explanation to overcome the apparent contradiction arising out of an alleged inability to work with a claimed ability to still perform "essential" job functions in the presence or absence of "reasonable accommodation." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). Only then can a plaintiff defeat summary judgment and Meier provides no such explanation. See Id. at 796. Just because Meier received benefits and qualified under supplemental social security income standards does not mean that he is ADA disabled. Plaintiff fails to fulfill the ADA criteria and is therefore not disabled thereunder.

A record of disability means that a plaintiff "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Because courts must determine the

---

[8] Since the onset of mental limitations in 1993, Meier received a medical vocational allowance and has remained eligible for Supplemental Security Income (Pl. App. 64-66). It appears that Meier continued to obtain the Supplemental Security Income throughout his employment with Family Dollar, though the record is unclear as to the nature and scope of such benefits after 1997.

existence of potential disabilities on a "case-by-case" basis, "'whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.'" Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); 29 C.F.R. § 1630.2(j)). A record sustaining past head trauma does not, without more, offer a finding of substantial life activity restriction. There is no indication that Family Dollar ever received medical evidence of Meier's head trauma and therefore could not have based any employment decisions on it.

Meier also fails to prove that he is disabled under the third and final prong of § 1202(2) because no evidence exists that Family Dollar ever regarded Meier as a disabled employee. An employer must actually treat a person "as having a substantially limiting impairment" before an employee can claim that he "'is regarded as having'" a significant limitation that restricts major life activities. Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995). An employer's mere "knowledge that an employee exhibits symptoms which may be associated with an impairment does not necessarily show the employer regarded the employee as disabled." Webb v. Mercy Hosp., 102 F.3d 958, 960 (8th Cir. 2001). The plaintiff may prove that he was regarded as disabled if the employer "entertain[ed ] misperceptions about the individual . . . believ[ing] either that one ha[d] a substantially limiting impairment that one [did] not have or that one ha[d] a substantially limiting impairment when, in fact, the impairment [was] not so limiting.'" Conant v. City of Hibbing, 271 F.3d 782, 785 (8th Cir. 2001) (quoting Sutton, 527 U.S. 471, 489 (1999)).

Meier testified at his deposition that he once mentioned to his immediate supervisor, Mr. Hoult, in the course of conversation that "I used to be a pretty good baseball player until my accident happened." In addition, Meier claims that the visible scar and indentation on his right temple and slower-than-normal speech effectively put his employer on notice that he was mentally impaired. Yet, Meier never requested accommodations for

11

a mental or physical limitation and worked satisfactorily at his shipping loader position for over one year. Plaintiff's own vocational expert, Dr. Asnejo, admitted that Meier suffered from a "hidden" disability that was not necessarily obvious to others like a deformed or missing limb would be. According to ADA protocol, "[i]f a job applicant or employee has a 'hidden' disability . . . it is up to that individual to make the need for an accommodation known." ADA Tech. Assist. Man. III, § 3.6 (1992).

Even if Family Dollar knew that Meier suffered from a mental impairment, an awareness of limitation is not sufficient to sustain that an employer went so far as to regard a particular employee as disabled. See, e.g., (Taylor v. Nimock's Oil Company, 214, F.3d 957, 961 (8th Cir. 2000) ("knowing that an employee may be having medical difficulties and expressing concern . . . does not amount to treating an employee as if she has a permanent disability that substantially limits her life activities"); Ceretti v. Runyon, No. 97-3109, 1998 WL 403199, at *2 (8th Cir. July 16, 1998) (noting that awareness of an employee's status as a disabled veteran, without more, did not mean the employer regarded employee as disabled under the ADA). This court disagrees with Meier's contention that Family Dollar should have regarded Meier as disabled because his appearance and demeanor "obviously" made him disabled. Stereotyping any individual on the basis of a scar on the head or somewhat stilted speech alone goes against the spirit of the ADA. See 29 U.S.C. § 12101(a)(2). Meier did work successfully in his former warehousing position at Family Dollar and did perform well as a bulk order filler with close personal attention from his supervisors.

## Qualified Individual With a Disability

Family Dollar claims that Meier had not made the requisite showing that he was able to perform the essential functions of his job as a bulk order filler, with or without reasonable accommodation, and is therefore not a qualified individual with a disability. According to Family Dollar, the essential functions of Meier's position as a bulk order filler entail arranging, labeling, and loading boxes onto a conveyor belt in accordance with

progressive engineered standards that require 100% productivity within six weeks. Meir argues that he could potentially meet production quotas with special instruction and cites job restructuring within the company as a reasonable accommodation. Meier believes that he should have been returned to an available shipping loader position under the company's transfer policy where he had a history of successfully performing essential job functions.

Protection under the ADA extends only to "a qualified individual with a disability." Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1111 (8th Cir. 1995) (citing 42 U.S.C. § 12112(a)). Determining whether an individual is qualified requires a two-part analysis: "(1) whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation." Id. at 1111-1112. Family Dollar does not take issue with the first requirement. It is the second prong of this inquiry that is disputed.

"An essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998) (quoting 29 C.F.R. § 1630.2(n)(1)). Factors to be considered when determining the essential functions of a job include:

(1) the employer's judgment as to which functions are essential;

(2) written job descriptions prepared before advertising or interviewing applicants for the job;

(3) the amount of time spent on the job performing the function;

(4) the consequences of not requiring the incumbent to perform the function; and

(5) the current work experience of incumbents in similar jobs.

Id., (quoting 29 C.F.R. § 1630.2(n)(3)). Another factor to consider in determining whether a job function is considered essential is whether there is only a "limited number of employees available among whom the performance of that job function can be distributed." Id. (quoting 29 C.F.R. § 1630.2(n)(2)).

The essential function of the bulk order filler post required an employee to label and arrange boxes on a conveyor belt in accordance with published company production standards. Meier does not dispute that he consistently failed to meet the progressive production quotas set by Family Dollar management, even though he received personal instruction from supervisors to help him improve productivity. Instead, Meier claims that Family Dollar could have reasonably accommodated him vis-a-vis a transfer back to an available shipping loader position in accordance with the company's transfer policy codified in the Handbook. The relevant Handbook guideline states that:

> If within 30 calendar days of starting a new job, the associate decides that he/she does not want the job, or if the associate is unable to meet or exceed the minimum standards of the job, he/she has the options of returning to their previous job assignment with a six month transfer restriction (providing there is a vacancy), accepting a General Warehouse position until the restriction ends, or terminating his or her employment.

(App. D-24). The issue is whether or not Meier remained eligible for transfer after receiving corrective action forms given his repeated failure to meet production standards.

The eligibility requirements of the transfer policy dictate that an "associate must have demonstrated acceptable job performance" and "not have more than two written counselings for reasons other than attendance and safety." (App. D-24). Furthermore, supervisor Diltz testified that any employee with a final recorded correction action and counseling would be precluded from transfer. Progressive weekly engineered standards are visibly posted on company grounds and applied evenly to all Family Dollar employees. Individual employee performance is also listed publicly. Meier acknowledged in writing

14

that he did not meet weekly production standards on several occasions. Meier's supervisors worked with him on a individual basis many times and discussed his lack of productivity. Meier's performance improved with the personal attention, but he continued to underproduce. Meier received four corrective action and counseling forms within six weeks of transferring into the bulk order filler post.

Meier claims that he did not receive timely corrective action forms and was not permitted the week long improvement grace periods suggested in the Handbook guidelines. Even if this Court believed such statements to be true, as discussed *infra*, the Handbook disclaimer clearly stipulates that all policy guidelines are suggestive in nature and subject to change with or without notice. Meier was aware that he failed to meet production quotas, did receive at least one additional "free" week to increase his workload, and supervisors provided adequate explanation and personal attention over time to help Meier improve. Even if Meier did not fall outside of the company's eligibility requirements for transfer, which he did do, the employer retained authority to discharge an employee at will. There is no evidence that Meier was fired for any other reason than a failure to meet production quotas.

Although Meier contends that Family Dollar did not reasonably accommodate his disability by rejecting his request to transfer back to a shipping loader post or to a general warehouse slot, it is well settled law that an employer neither has any affirmative obligation nor is expected to "'accommodate disabilities of which it is unaware.'" Miller v. Natal Casualty Co., 61 F.3d 627, 629 (8th Cir. 1995) (quoting 29 C.F.R. § 1630.9 (1994)). The proposition that the employer must have knowledge that a physical/mental limitation exists before he is required to provide a reasonable accommodation "has been affirmed repeatedly by other courts construing both the ADA and the Rehabilitation Act of 1973." Id. (citing e.g., Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-34 (7th Cir. 1995); Landefield v. Marion Gen. Hosp., Inc., 994 F.2d 1178, 1181-82 (6th Cir. 1993); McIntyre v. Kroger Co., 863 F. Supp 355, 358-59 (N.D. Tex., 1994); Mazzarella v. U.S.

15

Postal Serv., 849 F. Supp. 89, 96-97 (D.Mass. 1994)). The responsibility generally rests with "the [disabled] individual . . . to inform the employer that an accommodation is needed." 29 C.F.R. app. § 1630.9; see Taylor v. Principal Fin. Group, Inc., 93 F.3d 155 (5th Cir. 1996).

Aside from Meier's obscure reference to his accident, he never disclosed that he had a mental disability to his employer. And as previously discussed, there is no evidence that Meier's alleged symptoms were "obviously manifestations of an underlying disability" such that one might reasonably "infer that an employer actually knew of the disability." Hedberg, 47 F.3d at 934. "Where there is no real issue that an employer who fired a disabled employee knew nothing of the disability, summary judgment in favor of the employer is appropriate." Id.

## Adverse Employment Action Due to Disability

Meier has failed to demonstrate that he was discharged because of a disability and therefore cannot survive the third and final prima facie prong. A plaintiff must demonstrate a "'specific link between the alleged discriminatory animus and the challenged decision'" such that a reasonable factfinder could conclude that Meier's mental impairment provided the impetus for the termination. Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005) (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). Either direct evidence or "circumstances giving rise to an inference of unlawful discrimination" will suffice. Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 657 (8th Cir. 2001). Because Defendant identified a legitimate reason (i.e. failure to meet production quotas) for terminating Meier's employment, the burden shifts back to the plaintiff to prove that the defendant's purported reason is pretextual in nature. See Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir. 1996), cert. denied, 117 S. Ct. 274 (1996). There is no indication in this case that Family Dollar employees harbored animosity toward disabled persons or that like situated employees were treated disparately from Meier. See Lowery, 244 F.3d at 657-58 (noting that a "disparate-treatment showing" between disabled

16

and non-disabled employees on similar positions constitutes sufficient evidence of discrimination). Speculative allegations without factual support are insufficient to survive summary judgment. See Jeseritz v. Potter, 282 F.3d 542, 546-47 (8th Cir. 2002) (describing how claims of a conspiracy to discharge for a disability, without more, fail to demonstrate a pretext).

Plaintiff's Breach of Contract Claim

Plaintiff claims that defendant breached its unilateral contract of employment when Family Dollar discharged Meier in lieu of transferring him to his previous shipping loader post in accordance with the company's job transfer policy. Defendant argues that Plaintiff cannot establish a prima facie case for the existence of any such employment contract.

The common-law doctrine of employment at will is firmly grounded in Iowa law. E.g., Wolfe v. Graether, 389 N.W.2d 643, 562 (Iowa 1986); Abrisz v. Pulley Freight Lines, Inc., 280 N.W.2d 454, 455 (Iowa 1987); Anderson v. Douglas & Lomason Co., 540 N.W.2d 277, 281 (Iowa 1995). As a general rule, if no employment contract exists, either party may terminate the relationship at any time for any lawful reason, Jones v. Lake Park Care Ctr., 569 N.W.2d 369, 374 (Iowa 1997), or for no reason at all. Lara v. Thomas, 521 N.W.2d 777, 781 (Iowa 1994). There are two narrow exceptions to this general rule: when the termination clearly violates a well-defined and recognized public policy, Springer v. Weeks & Leo Co., 429 N.W.2d 558, 560 (Iowa 1998), and when an employer's handbook or policy manual guarantees an employee that discharge will occur solely for cause or under specific conditions. McBride v. City of Sioux City, 444 N.W.2d 85, 90 (Iowa 1989).

To establish a contract under Iowa law, a company handbook must first meet the requirements for a unilateral contract. Thompson v. City of Des Moines, 564 N.W.2d 839, 844 (Iowa 1997). An employee handbook may create a unilateral contract if: (1) the handbook is sufficiently definite in its terms to create an offer; (2) the handbook has been communicated to and accepted by the employee so as to constitute acceptance; and (3) the

17

employee continues working, so as to provide consideration. Anderson, 540 N.W.2d at 283. The party claiming the existence of such a contract bears the burden of proving its existence. Thompson, 564 N.W.2d at 844. The key to determining whether a contract has been created is whether a reasonable employee, when reading the handbook, would believe that the employer guaranteed him certain protections. Jones, 599 N.W.2d at 374.

To determine whether the language of an employee handbook creates a contract and whether an employee is reasonably justified in understanding that a commitment has been made, the court asks these questions: (1) is the handbook in general a set of guidelines or directives?; (2) is the language detailed or vague?; and (3) does the employer retain the power to alter company procedures at will or are they invariable? Anderson, 540 N.W.2d at 286. If the language of the handbook is vague, creates procedural guidelines, and reserves the right for the employer to change procedures, the handbook fails to create a unilateral contract. In addition to the above factors, it is important to consider any disclaimers intended "to prevent an employee handbook or manual from forming a contract by clarifying the employer's intent not to make an offer." Kurtheiser v. Amer. Nat. Can Co., 84 F. Supp.2d 1008, 1015 (S.D. Iowa 1999) (citing Phipps v. IASD Health Serv. Corp., 558 N.W.2d 198, 204 (Iowa 1997)). After all, "'[i]n the context of employee handbooks, the essential purpose of a disclaimer is to claim at-will status for the employment relationship by repudiating or denying liability for statements expressed in the handbook.'" Anderson, 588 N.W.2d at 287. Under Iowa law, an enforceable disclaimer must have both clear terms and provide unambiguous coverage. Phipps, 588 N.W.2d at 204 (citing Anderson, 540 N.W.2d. at 288).

Family Dollar does not contend that the Handbook was not communicated to Meier or that Meier failed to provide consideration. Family Dollar rests its motion for summary judgment on the premise that the Handbook fails to create a valid offer. In this case, Family Dollar included a prominent, unambiguous disclaimer at the beginning and end of the Handbook. Family Dollar expressly stipulated that no policies or procedures contained

therein created a contract for employment. Additionally, the disclaimer explained that the employer reserved the right to modify or discontinue any policies or procedures at any time with or without giving notice. The disclaimer unequivocally applies to the entire Handbook, thereby providing unambiguous coverage. As a matter of law, the Handbook did not create a unilateral contract and Meier remained at all times an at-will employee. The disclaimer ensured that the Handbook could not create an offer capable of acceptance. In further support that an employee could not reasonably believe that the Handbook created a contract, the first page thereof specifically set forth those conditions under which an employment contract would arise. Only the President and/or Chairman of Family Dollar were authorized to create an employment contract, which would have to be in writing and signed separately. Therefore, Family Dollar clearly communicated its intent not to create a contract through its Handbook and could not breach a contract that never existed.

Meier also contends that the Acknowledgment of Major Company Policies form submitted for each employee's signature upon receipt of the Handbook effectively disclaims any at-will disclaimer because it provides for a two-week notice requirement upon resignation. To support this theory, Meier mistakenly relies on an Iowa Supreme Court case which found that a unilateral contract existed under distinguishable facts. See Jones v. Lake Park Care Ctr., Inc., 569 N.W.2d 369, 376 (1997) (noting that the employer provided no disclaimer whatsoever). A request that employees provide standard two-week notice when resigning does not abrogate the at-will nature of an employment relationship. See Stow v. Cochran, 819 F.2d 864, 866 (8th Cir. 1987) (noting that a notice provision requirement does nothing more than confirm an employee's existing right to quit).

As set forth above, the court finds that the material facts demonstrate that Meier failed to establish a proper prima facie case either for employment discrimination under the ADA or for breach of contract claim.

19

IT IS ORDERED that the defendant's motion for summary judgment is granted. This case is dismissed. The Clerk of Court shall enter judgment for the defendant.

August 4, 2006.

```
_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT
```